## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**CARLTON PARKS**                                   **CIVIL ACTION**

**VERSUS**                                          **NO. 12-0297**

**BURL CAIN, WARDEN**                               **SECTION "F"(5)**

### REPORT AND RECOMMENDATION

This matter was referred to a United States Magistrate Judge to conduct hearings, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations pursuant to 28 U.S.C. §636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases. Upon review of the entire record, the Court has determined that a federal evidentiary hearing is unnecessary. <u>See</u> 28 U.S.C. §2254(e)(2).[1] For the following reasons, it is recommended that the instant petition for habeas corpus relief be **DISMISSED WITH PREJUDICE**.

---

[1]Under 28 U.S.C. §2254(e)(2), whether to hold an evidentiary hearing is a statutorily mandated determination. Section 2254(e)(2) authorizes the district court to hold an evidentiary hearing only when the petitioner has shown either that the claim relies on a new, retroactive rule of constitutional law that was previously unavailable, 28 U.S.C. §2254(e)(2)(A)(i), or the claim relies on a factual basis that could not have been previously discovered by exercise of due diligence, 28 U.S.C. §2254(e)(2)(A)(ii); and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner. 28 U.S.C. §2254(e)(2)(B).

**PROCEDURAL BACKGROUND**

The petitioner, Carlton Parks, is a state prisoner who is presently incarcerated at the Louisiana State Penitentiary, Angola, Louisiana.  On July 5, 2006, a bill of information was filed charging Parks with manslaughter in violation of LSA-R.S. 14:31.[2] On April 16, 2007, a superceding indictment was filed charging Parks with second degree murder in violation of LSA-R.S. 14:30.1.[3] On August 23, 2007, following trial by jury in the Twenty-Fourth Judicial District Court for the Parish of Jefferson, State of Louisiana, Parks was found guilty of murder in the second degree.[4] Parks was sentenced to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence.[5]

On appeal, Parks raised the following claims:  1) the trial court erred in denying his motion in limine which sought to exclude inadmissible hearsay; and, 2) the trial court erred in denying his motion to suppress statements.[6]  On November 25, 2008, the Louisiana Fifth Circuit Court of Appeal affirmed Parks' conviction and sentence, but remanded the matter, directing the trial court to advise Parks of his two-year time limit to seek post-conviction

---

[2]St. Rec. Vol. 3 of 8, p. 22.

[3]St. Rec. Vol. 3 of 8, p. 24.

[4]St. Rec. Vol. 3 of 8, pp. 16-20, 73.

[5]St. Rec. Vol. 5 of 8, p. 538.

[6]St. Rec. Vol. 5 of 8, tab 11.

relief.  State v. Parks, 2 So.3d 470, No. 2008-KA-0423 (La. App. 5 Cir. 11/25/08).[7]  On October 2, 2009, the Louisiana Supreme Court denied Parks' writ application without opinion.  State v. Parks, 18 So.3d 101 (La. 2009).[8]

On November 16, 2009, Parks filed an application for post-conviction relief.[9]  Parks raised the following claims: 1) he was denied his right to appellate review and his right to a complete transcript; 2) the evidence was insufficient to support his conviction; 3) defense counsel refused to allow him to testify on his own behalf; 4) he received ineffective assistance of trial counsel; and, 5) he received ineffective assistance of appellate counsel.  On April 6, 2010, the district court denied Park's post conviction application.[10]  On May 28, 2010, the Louisiana Fifth Circuit Court of Appeal denied Parks' writ application.  State ex rel. Parks v. State, No. 2010-KH-0358 (La. App. 5 Cir. 5/28/10) (unpublished opinion).[11]  On September 16, 2011, the Louisiana

---

[7]St. Rec. Vol. 1 of 8, tab 1.

[8]St. Rec. Vol. 7 of 8, tab 13.

[9]St. Rec. Vol. 1 of 8, tabs 3 and 4.

[10]St. Rec. Vol. 2 of 8, tab 7.

[11]St. Rec. Vol. 2 of 8, tab 8.

Supreme Court denied Parks' writ application without opinion. State ex rel. Parks v. State, 69 So.3d 1134 (La. 2011).[12]

On January 17, 2012, Parks filed the instant habeas corpus petition raising the following claims: 1) the court erred in denying his motion in limine which sought to exclude inadmissible hearsay; 2) the court erred in denying his motion to suppress his statements; 3) he was denied his right to appellate review and his right to a complete transcript; 4) the evidence was insufficient to support his conviction; 5) defense counsel refused to allow him to testify on his own behalf; 6) he was denied effective assistance of trial counsel; and, 7) he was denied effective assistance of appellate counsel.[13]   The State filed a response[14] in which it concedes and this Court finds that Parks' habeas application is timely.   The State, however, argues that Parks has failed to exhaust his state court remedies with respect to claim 2), that Parks is procedurally barred from raising claims 4) and 5), and that Parks's remaining claims are without merit.   Parks filed a traverse[15] to the State's response.   The Court shall consider Parks' petition, the State's response, and Parks' traverse following its recitation of the facts and standard of review.

---

[12]St. Rec. Vol. 2 of 8, tab 10.

[13]Rec. Doc. No. 5-1.

[14]Rec. Doc. No. 13.

[15]Rec. Doc. No. 14.

4

**FACTS**[16]

After Hurricane Katrina, Milton Brown and Carlton Parks, along with many others, moved to the New Orleans area to obtain work repairing houses and other buildings that were damaged by the storm. In December of 2005, Milton Brown met Desmarie Johnson, a local nurse, and began dating. At Mr. Brown's request, Ms. Johnson invited Brown's co-worker and roommate, Carlton Parks, to spend New Year's Eve with them.

That night, Ms. Johnson also invited her sixty-one-year-old aunt, Florence White to spend the evening with them. That night, Mr. Parks, who was forty-four, was introduced to Mrs. White. Although Mrs. White might have been amenable to a romantic relationship with Mr. Parks, he was not interested in Mrs. White romantically.

In February of 2006, Mr. Brown and Mr. Parks, who worked and lived together, lost their jobs and apartment. Ms. Johnson permitted Mr. Brown to stay at her home but refused to allow Mr. Parks to stay with her. Mr. Parks asked Mrs. White for a place to stay because he had "no one else."

Mrs. White allowed Parks to move into her house at 233 Capital Drive in Avondale, Louisiana. At first, Mr. Parks stayed in an unused bedroom on the first floor, but within a few weeks, he began

---

[16]The facts noted hereinafter are as set forth by the state appellate court in connection with Parks' direct appeal. State v. Parks, 2 So.3d 470, No. 2008-KA-0423 (La. App. 5th Cir. 11/25/08).

spending more time in the FEMA trailer that was parked in front of Mrs. White's house.  Again, it is undisputed that Mrs. White and Parks were not involved romantically.

On May 4, 2006, at 11:14 p.m., Mrs. White called her niece, Ms. Johnson.  Mrs. White, who was crying, reported that Parks had threatened her.  Ms. Johnson knew that Parks had a gun, which he had fired in Mrs. White's house on two previous occasions, so she went to her aunt's house.

After Ms. Johnson and Mr. Brown arrived at White's house at 11:45 p.m., they knocked on the front door and called for Mrs. White but she did not answer.  While they were knocking, Mr. Parks opened the door of the FEMA trailer to ask what his friends were doing.  When Ms. Johnson asked about her aunt, Mr. Parks volunteered that Mrs. White was in the house.  When Ms. Johnson informed Mr. Parks that her aunt would not answer her door, Mr. Parks said that Mrs. White may have gone out for a walk.  Mr. Parks then returned to the trailer, where he had a female guest, and closed the door.

Ms. Johnson and Mr. Brown went around the house knocking and calling out to Mrs. White, but there was still no answer. Eventually, Ms. Johnson found a way into her aunt's house.  When Ms. Johnson entered the house, she found that the lights and television were on, and DVDs were scattered on the floor in the den.

While searching the house, Ms. Johnson found her aunt lying on the floor of the living room, face down in a pool of blood with blood draining from her left ear.  When Ms. Johnson checked her aunt's vital signs, she noticed that Mrs. White's body was "really warm" so Ms. Johnson tried to revive her to no avail.  When Mrs. White did not respond, Mr. Brown called 911.

Around this time, Mr. Parks entered the house.  When Ms. Johnson confronted him, he said, "I didn't do anything.  You think I would do anything to Flo?  She's all I had."  Brown recalled that Park's demeanor was "strange," as he was not crying and showed no emotion.  Mr. Brown subsequently saw Parks leave the house and go toward the backyard where a canal was located.  Mr. Brown did not know why Mr. Parks went to the backyard.

Dr. Susan Garcia, an expert forensic pathologist, performed the autopsy on Mrs. White.  She testified that White sustained a tight-contact gunshot wound to the left ear canal that resulted in lethal injury to her brain.  Dr. Garcia explained that the only way to sustain such a wound is for the gun barrel to be inserted into Mrs. White's ear canal at the time of discharge.

Dr. Garcia testified that she could not rule out suicide from a purely medical standpoint; however, after learning information found during the ensuing investigation, Dr. Garcia determined that the cause and manner of death was homicide.  Dr. Garcia stated that

Mrs. White's wound was not consistent with someone struggling over a weapon.

Detective Jeffery Rodrigue of the Jefferson Parish Sheriff's Office ("JPSO") testified that the sheriff's search of White's residence uncovered the following items, among other things: one round of Winchester .38 caliber ammunition from the drawer of the nightstand in the bedroom on the first floor; Park's Ochsner ID in the same bedroom, and two partial projectiles found lodged in the front door and the sofa. Further, the sheriff's search of the FEMA trailer revealed a black backpack, which contained a box of Winchester .38 special ammunition. Rodrigue and JPSO Detective Dave Morales testified that the gun used to shoot the victim was never found.

Louise Walzer, a firearms expert, testified that the projectile recovered from the victim during the autopsy was .38 caliber ammunition. Her report indicated that a partial projectile recovered from the sofa was also .38 caliber ammunition. She further testified that the projectile and the partial projectile were consistent with having been fired from the same type of weapon, which included a Smith and Wesson Combat Masterpiece.

At trial, local attorney Leopold Sher testified that, during December 2005 and January 2006, employees of Kennedy Construction, including Parks and Brown, repaired storm damage to his father's apartment in New Orleans, which was also his boyhood home. He

further testified that, when he got married in 1975 and moved out of that apartment, he left a yellow box of bullets and his .38 Smith and Wesson Combat Masterpiece revolver in a pouch in a dresser drawer in his bedroom.  He identified the box of ammunition found in Park's backpack as very similar to his box.  In 2006, Sher looked for his weapon and box of bullets in the apartment, but could not find them.

Milton Brown testified that he saw a handgun in a pouch in a dresser drawer while he was working at the elder Sher's apartment. After he saw it, he told Parks about it.  Two days later, at their apartment, Brown saw Parks remove that same gun and a yellow box from his backpack.

Detective Morales testified that he took two statements from defendant after he waived his rights.  During the first statement, defendant said that he borrowed Mrs. White's car to pick up his friend, Julie Hamilton so they could watch movies in his trailer. When defendant got home, Mrs. White was standing outside of her house leaning against a car in the driveway.  After defendant introduced Hamilton to White, he and Hamilton went into the trailer.  He then went inside Mrs. White's house to get the DVD player so that he and Hamilton could watch a movie.  While they were watching the movie, Mrs. White knocked on the trailer door and asked to speak with Ms. Hamilton.  Defendant refused, closed the door, and continued watching the movie.

9

Defendant then stated that he heard someone knocking on White's door about twenty minutes later.  When he opened his door, he saw Ms. Johnson, who told him her aunt had called crying. Defendant closed the trailer door and finished watching the movie. About 10 minutes later, Mr. Brown came to the door to tell him that Mrs. White was lying on the floor in blood.  Defendant left the trailer, went inside White's house, felt her artery, and said, "She's gone."  Mr. Brown then called 911.

Defendant thought that White might have been jealous and angry because he used her car to pick Hamilton up so they could watch movies together. Defendant also kept saying, during this statement, that, although he knew that Mrs. White may have been interested in a romantic relationship with him, he had told her many times that he wanted to have kids of his own, which required a younger woman.

During the second statement, defendant changed his story.  He said that he went back into Mrs. White's house a second time to get a DVD.  As he was about to go back outside, Mrs. White was standing in the living room facing him with her back to the door.  Mrs. White had a gun in her hand and told him that she hated him and wanted him and Hamilton to leave.  Mrs. White then put the gun to her head and pulled the trigger before defendant could stop her. After Mrs. White fell to the floor, defendant realized she was not breathing.  He checked her carotid artery, grabbed the gun from the

floor, and returned to his trailer.  After entering his trailer, defendant immediately hid the gun so Ms. Hamilton would not see it.

Defendant stated that the gun was his because he had found it. When asked, defendant could not remember where or when he found the gun.  He reported that Mrs. White was holding the gun for him because he had previously discharged the gun twice in her home. Defendant claimed that he had been drinking beer on the day of the earlier incident so he could not remember what happened.  Defendant stated that, after Mrs. White recounted the incident, he was afraid to have the gun, so he asked Mrs. White to get rid of it for him.

JPSO Sergeant Eddie Klein testified that he took a third statement from defendant.  In the third statement, defendant changed his story again.  He said that when he was preparing to leave Mrs. White's house after getting the DVD, he saw her standing in the living room with a gun in her hand.  Mrs. White told defendant that she wanted him and Hamilton to leave and that she was going to kill him.  Mrs. White pointed the gun at him as defendant approached her, grabbed the gun, and tried to stick his thumb "between the hammer" to keep it from firing.  However, the gun went off during the struggle, and a bullet struck Mrs. White, who fell to the ground.  Defendant panicked, grabbed the gun, and went out the front door.  He did not know what he did with the weapon.

11

Officers from the sheriff's office testified that, initially, the defendant's right hand and the victim's left hand tested positive for gunshot residue. Morales testified that it was a mistake not to test defendant's clothes for gunshot residue; however, he did not see anything on those clothes.

Further testing, which is always performed in gunshot residue analysis, reflected that there was no gunshot residue on defendant's right hand. The testing also revealed that the victim's left hand had only single component particles, which is not consistent with firing a revolver at close proximity. The expert stated that, if a person shot herself in the head with her left hand, he would have expected to find more particles than he saw in this case.

JPSO Captain Timothy Scanlan, an expert in firearms, toolmark identification, and bloodstain pattern analysis, testified that it was very common for a victim who has been shot to have gunshot residue on his or her hands. He also testified it would be common for a person who shoots a weapon and was tested five or six hours later (as defendant was) to not have gunshot residue on his or her hands. Scanlan stated that he would not expect a person who puts a gun in someone's ear and discharges it to have a significant amount of blood or "back spatter" on him.

The defense did not call any witnesses. After hearing the testimony and reviewing the physical evidence, the twelve-person

jury in the Twenty-Fourth Judicial District Court for the Parish of Jefferson, State of Louisiana, found defendant guilty of second degree murder.

**STANDARD OF REVIEW**

28 U.S.C. §§2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law and mixed questions of fact and law in federal habeas corpus proceedings. <u>Nobles</u>, 127 F.3d 409, 419-20 (5th Cir. 1997) (citing 28 U.S.C. §2254(b) and (c)), <u>cert</u>. <u>denied</u>, 523 U.S. 1139 (1998).

Determinations of questions of fact by the state court are "presumed to be correct ... and we will give deference to the state court's decision unless it 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" <u>Hill v. Johnson</u>, 210 F.3d 481, 485 (5th Cir.2000) (quoting 28 U.S.C. §2254(d)(2)), <u>cert</u>. <u>denied</u>, 532 U.S. 1039 (2001). The amended statute also codifies the "presumption of correctness" that attaches to state court findings of fact and the "clear and convincing evidence" burden placed on a petitioner who attempts to overcome that presumption. 28 U.S.C. §2254(e)(1).

A state court's determination of questions of law and mixed questions of law and fact are reviewed under 28 U.S.C. §2254(d)(1) and receive deference, unless the state court's decision "'was contrary to, or involved an unreasonable application of, clearly

13

established [Supreme Court precedent.]'"   <u>Penry v. Johnson</u>, 215 F.3d 504, 507 (5th Cir.2000) (quoting <u>Miller v. Johnson</u>, 200 F.3d 274, 280–81 (5th Cir.), <u>cert</u>. <u>denied</u>, 531 U.S. 849 (2000)), <u>aff'd in part, rev'd in part on other grounds</u>, 532 U.S. 782 (2001); <u>Hill</u>, 210 F.3d at 485.  The United States Supreme Court has clarified the Section 2254(d)(1) standard as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

<u>Williams v. Taylor</u>, 529 U.S. 362, 405–06, 412–13 (2000); <u>Penry</u>, 532 U.S. at 792–93; <u>Hill</u>, 210 F.3d at 485.  "'A federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state court decision applied [a Supreme Court case] incorrectly.'"  <u>Price v. Vincent</u>, 538 U.S. 634, 641 (2003) (quoting <u>Woodford v. Visciotti</u>, 537 U.S. 19, 24–25 (2002)) (brackets in original); <u>Bell v. Cone</u>, 535 U.S. 685, 699 (2002).  Rather, under the "unreasonable application" standard, "the only question for a federal habeas court is whether the state court's determination is objectively unreasonable."  <u>Neal v. Puckett</u>, 286 F.3d 230, 246 (5th Cir.2002), <u>cert</u>. <u>denied</u>, <u>sub nom</u>, <u>Neal v. Epps</u>, 537 U.S. 1104 (2003).  The burden is on the

14

petitioner to show that the state court applied the precedent to the facts of his case in an objectively unreasonable manner. Price, 538 U.S. at 641 (quoting Woodford, 537 U.S. at 24-25); Wright v. Quarterman, 470 F.3d 581, 585 (5th Cir.2006).

**EXHAUSTION**

A fundamental prerequisite to federal habeas relief under §2254 is the exhaustion of all claims in state court prior to requesting federal collateral relief. Whitehead v. Johnson, 157 F.3d 384, 387 (5th Cir.1998) (citing Rose v. Lundy, 455 U.S. 509, 519-20 (1982)); accord Preiser v. Rodriguez, 411 U.S. 475, 500 (1973); Nobles v. Johnson, 127 F.3d 409, 419 (5th Cir. 1997). "A federal habeas petition should be dismissed if state remedies have not been exhausted as to all of the federal court claims." Whitehead, 157 F.3d at 387 (citing 28 U.S.C. §2254(b)(1)(A); Rose, 455 U.S. at 519-20).

"The exhaustion requirement is satisfied when the substance of the federal habeas claim has been fairly presented to the highest state court." Id. (citing Picard v. Connor, 404 U.S. 270, 275-78 (1971)). "A federal court claim must be the "substantial equivalent" of one presented to the state courts if it is to satisfy the 'fairly presented' requirement." Whitehead, 157 F.3d at 387 (citing Picard, 404 U.S. at 275-78). "This requirement is not satisfied if the petitioner presents new legal theories or new

15

factual claims in his federal application." Id. (citing Nobles, 127 F.3d at 420).

The State asserts that Parks did not exhaust his state court remedies regarding his claim that his statements should have been suppressed (claim 2), because he offered different arguments in support of his claim to the state appellate court and state supreme court.[17]   Nevertheless, because claim 2) is without merit, this Court will address the merits of said claim without requiring full exhaustion.   28 U.S.C. §2254(b)(2).

**PROCEDURAL DEFAULT**

Generally, a federal court will not review a question of federal law decided by a state court if the decision of that state court rests on a state ground that is both independent of the federal claim and adequate to support that judgment. Coleman v. Thompson, 501 U.S. 722, 731-32 (1991); Glover v. Cain, 128 F.3d 900, 902 (5th Cir.1997); Amos v. Scott, 61 F.3d 333, 338 (5th Cir.1995) (citing Harris v. Reed, 489 U.S. 255, 260, 262 (1989)). This "independent and adequate state law" doctrine applies to both substantive and procedural grounds and affects federal review of claims that are raised on either direct or habeas review.  Amos, 61 F.3d at 338.

Procedural default does not bar federal court review of a federal claim raised in a habeas petition unless the last state

---

[17]Rec. Doc. No. 13, p. 18.

court to render a judgment in the case has clearly and expressly indicated that its judgment is independent of federal law and rests on a state procedural bar.  <u>Harris</u>, 489 U.S. at 263; <u>Glover</u>, 128 F.3d at 902.  When the last state court judgment does not indicate whether it is based on procedural default or the merits of a federal claim, it is presumed that the court relied upon the same grounds as the last reasoned state court opinion.  <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 802 (1991).

In claim 4), Parks argues that there was insufficient evidence to support his conviction.  In claim 5), Parks complains that defense counsel denied him his constitutional right to testify on his own behalf.  Parks first raised these claims in his state court application for post-conviction relief.  The state trial court denied these claims pursuant to LSA-C.Cr.P. art. 930.4(C)[18] because they could have been raised on direct appeal, but were not.[19]  The Louisiana Fifth Circuit found no error with regard to the trial court's denial of claims 4) and 5).  <u>State ex rel. Parks v. State</u>,

---

[18]Article 930.4(C) provides: "If the application alleges a claim which the petitioner raised in the trial court and inexcusably failed to pursue on appeal, the court may deny relief."

[19]St. Rec. Vol. 2 of 8, tab 7.  The trial court also dismissed claim 5) on the merits.  However, when a state court finds a procedural default but proceeds to address the merits, the procedural bar serves as the basis of dismissal for purposes of habeas corpus review.  <u>Fairfax v. Scott</u>, 39 F.3d 319, 1994 WL 612311, *3 (5th Cir. 1994) (<u>per curiam</u>) (citing <u>Sawyers v. Collins</u>, 986 F.2d 1493, 1499 (5th Cir.), <u>cert</u>. <u>denied</u>, 508 U.S. 933 (1993)).

No. 2010-KH-0358 (La. App. 5 Cir. 5/28/10) (unpublished opinion).[20]
Parks' subsequent writ application to the Louisiana Supreme Court
was denied without reasons. <u>State ex rel. Parks v. State</u>, 69 So.3d
1134 (La. 2011).[21]

### <u>INDEPENDENT AND ADEQUATE</u>

For the foregoing state law procedural bar to prevent review
by this federal habeas court, the bar must be independent and
adequate.  A procedural restriction is "independent" if the state
court's judgment "clearly and expressly" indicates that it is
independent of federal law and rests solely on a state procedural
bar. <u>Amos</u>, 61 F.3d at 338.  To be "adequate," the state procedural
rule must be strictly or regularly followed and evenhandedly
applied to the majority of similar cases.  <u>Walker v. Martin</u>, ___
U.S. ___, 131 S.Ct. 1120, 1127 (2011); <u>Glover</u>, 128 F.3d at 902.

This Court has repeatedly held that article 930.4(C) is an
independent and adequate state ground for dismissal, which bars
review by the federal courts in a habeas corpus proceeding.  <u>See</u>
<u>Lewis v. Cain</u>, 2010 WL 4363546, *9 (E.D. La. 8/19/10) (Chasez,
MJ.), <u>report & recommendation adopted</u>, 2010 WL 4340795 (E.D. La.
10/21/10) (Feldman, J.); <u>Hurd v. Cain</u>, 2009 WL 3063354, *7 (E.D.
La. 9/23/09) (Lemmon, J.); <u>Rose v. Prince</u>, 2009 WL 2922801, *4
(E.D. La. 9/10/09) (Vance, J.); <u>Bell v. Cain</u>, 2002 WL 31002831, *4

---

[20]St. Rec. Vol. 2 of 8, tab 8.

[21]St. Rec. Vol. 2 of 8, tab 10.

18

(E.D. La. 8/29/02) (Africk, J.); <u>Gilkers v. Cain</u>, 2006 WL 1985969, *2 (E.D. La. 5/30/06) (Duval, J.).   The state procedural bar is presumptively adequate when the state court expressly relies on it in deciding not to review a claim for collateral relief.   <u>Glover</u>, 128 F.3d at 902.   The court in this case expressly ruled that Parks' claims would not be reviewed because he had the opportunity to raise them on appeal and did not.

Therefore, the Court finds that the bar, Article 930.4(C), was both independent and adequate to bar federal review of Parks' habeas claims that there was insufficient evidence to support his conviction and that he was denied his right to testify on his own behalf.[22]

**CAUSE AND PREJUDICE**

A federal habeas petitioner may be excepted from the procedural default rule only if he can show "cause" for his default and "prejudice attributed thereto," or demonstrate that the federal court's failure to review the defaulted claim will result in a "fundamental miscarriage of justice." <u>Glover</u>, 128 F.3d at 902 (citing <u>Coleman</u>, 501 U.S. at 731-32); <u>Amos</u>, 61 F.3d at 338-39

---

[22]The Court notes that Parks argues that the state court failed to comply with La.C.Cr.P. art. 930.4(F) by finding his claims defaulted without first ordering him to state the reasons for his default.   Rec. Doc. No. 14, p. 5.   However, the provisions of article 930.4(F) are inapplicable where, as in the instant case, the petitioner uses the state uniform application for post-conviction relief.   <u>State ex rel. Rice v. State</u>, 749 So.2d 650 (La. 1999); <u>see also Gilkers</u>, 2006 WL 1985969 at *2.

19

(citing <u>Harris</u>, 489 U.S. at 262; <u>Engle v. Isaac</u>, 456 U.S. 107, 129 (1982)).

To establish cause for a procedural default, a petitioner must demonstrate that some objective factor external to the defense impeded his efforts to comply with the state's procedural rule. <u>Murray v. Carrier</u>, 477 U.S. 478, 488 (1986).

Parks attributes his procedural default in failing to raise claims 4) and 5) on direct appeal to ineffective assistance of appellate counsel.[23]  A careful and broad review of Parks' post-conviction briefs reflects that he raised the claim that he received ineffective appellate counsel based upon counsel's failure to "properly peruse" the record for errors, thereby failing to raise claims on appeal.[24]  Based upon the fact that the ineffective assistance of appellate counsel claim was raised on post-conviction, the Court, in an abundance of caution, finds that said claim serves as "cause" for Parks' procedural default.[25]

_____

[23]Rec. Doc. No. 14, p. 6.

[24]<u>See</u> St. Rec. Vol. 1 of 8, tab 4, p. 18 (district court brief); St. Rec. Vol. 7 of 8, tab 15, p. 21 (appellate court brief); St. Rec. Vol. 7 of 8, tab 14, p. 25) (supreme court brief).

[25]The Court is mindful of the Supreme Court's decision in <u>Martinez v. Ryan</u>, __ U.S. __, 132 S.Ct. 1309 (2012), in which the Supreme Court found that in limited circumstances, a claim of ineffective assistance of counsel can serve as cause for a procedural default. However, as the Tenth Circuit Court of Appeals recently observed, the exception carved out under <u>Martinez</u> applies only to "'a prisoner's procedural default of a claim of ineffective assistance at <u>trial</u>,' not to claims of deficient performance by appellate counsel."  <u>Banks v. Workman</u>, 692 F.3d 1133, 1148 (10th

That Parks had cause for his procedural default does not authorize this Court to decide the merits of his defaulted claims. Parks must also show that he would be prejudiced if the Court did not review the merits of said claims.

The Court finds that Parks would not be prejudiced by the Court's failure to address his insufficient evidence claim. Under Jackson v. Virginia, 443 U.S. 307 (1979), Parks has the burden of showing that after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could not have found the essential elements of second degree murder were proven beyond a reasonable doubt. Id., 443 U.S. at 319; Perez v. Cain, 529 F.3d 588, 594 (5th Cir. 2008); Williams v. Cain, 408 Fed.Appx. 817, 821 (5th Cir. 2011).

Louisiana Revised Statute 14:30.1(A)(1) provides that "[s]econd degree murder is the killing of a human being ... [w]hen the offender has a specific intent to kill or to inflict great bodily harm." Based upon a review of the evidence presented at trial, the Court finds that Parks will not be prejudiced by this Court's failure to address the merits of his insufficient evidence claim.

_____

Cir. 2012) (emphasis original) (quoting Martinez, 120 S.Ct. at 1315).

Desmarie Johnson, the victim's niece, testified that Parks was living in a trailer parked in front of the victim's house.[26]  Ms. Johnson testified that Parks owned a gun, having fired it inside the victim's home at least two times.[27]

Johnson stated that on May 4, 2006, the victim called her, stating that Parks had brought a woman to the house and threatened that "if there is any shit in the house tonight that he had a gun."[28]  The victim asked Johnson to come over right away to be with her.[29]  When Johnson, along with her boyfriend, Milton Brown, arrived at the victim's home, they discovered the victim's body.[30]

Brown testified that while he and Parks were performing work at a home, they saw a blue pouch which contained a handgun.  They also found a box of shells.  Later, at the apartment they shared, Parks pulled out the handgun, along with a box of shells.[31]  A box of shells was later found in Park's trailer.[32]

---

[26]St. Rec. Vol. 3 of 8, pp. 146-47.

[27]St. Rec. Vol. 3 of 8, p. 147.

[28]St. Rec. Vol. 3 of 8, p. 149.

[29]St. Rec. Vol. 3 of 8, p. 149.

[30]St. Rec. Vol. 3 of 8, p. 154.

[31]St. Rec. Vol. 3 of 8, pp. 230-32.

[32]St. Rec. Vol. 4 of 8, pp. 305-06.

In one statement provided to police, Parks claimed that the victim killed herself.[33]  In another statement, Parks claimed that he and the victim struggled over the gun and the victim was shot.[34]  However, Alfred Schwoeble, qualified as an expert in gunshot residue,[35] testified that the gunshot residue found on the victim was not consistent with her having handled a gun in a struggle or in committing suicide.[36]  He explained that because no intervening factors, such as washing hands or putting hands in and out of pockets, can occur with a murder victim, generally he would expect to find "several hundred to a thousand or two gunshot particles."  He found only "three single component particles" on the victim's hand.[37]

Based upon the above, the Court finds there was more than sufficient evidence to support Parks' conviction.  Parks has not shown the requisite prejudice to successfully overcome his procedural default of this issue.

The Court also finds that Parks would not be prejudiced by this Court's failure to evaluate the merits of his claim that counsel denied him his right to testify on his own behalf.

_____

[33]St. Rec. Vol. 8 of 8, tab 18, p. 3.

[34]St. Rec. Vol. 8 of 8, tab 19, p. 2.

[35]St. Rec. Vol. 4 of 8, p. 393.

[36]St. Rec. Vol. 4 of 8, pp. 400-04.

[37]St. Rec. Vol. 4 of 8, p. 402.

"A criminal defendant has a constitutional right to testify in his own behalf; it is an aspect of his right to defend himself, a right held in <u>Rock v. Arkansas</u>, 483 U.S. 44, 51-53 (1987), to be implicit in the Fifth, Sixth and Fourteenth Amendments." <u>Underwood v. Clark</u>, 939 F.2d 473, 475 (7th Cir.1991) (citations omitted); <u>see also</u> <u>White v. Cain</u>, 2006 WL 3703240, *4 (E.D.La. 12/11/06) (Knowles, MJ.), <u>report & recommendation adopted</u> (Vance, J.). **A habeas petitioner, however, has the burden of proving that he was denied this constitutional right**. As the court explained in <u>Turcios v. Dretke</u>, 2005 WL 3263918, *6 (S.D.Tex. 11/29/05), "a petitioner in a habeas proceeding cannot prevail on such a claim merely by stating to the habeas court that he told his trial attorney that he wished to testify and that his attorney forbade him from taking the witness stand. <u>Underwood v. Clark</u>, 939 F.2d 473, 475-76 (7th Cir.1991)." The <u>Underwood</u> court specifically noted the potential problem posed if a habeas petitioner, arguing that counsel unconstitutionally denied him his right to testify, is not required to satisfy his burden of proof.

> There is grave practical difficulty in establishing a mechanism that will protect a criminal defendant's personal right (that is, a right not waivable by counsel) to testify on his own behalf without rendering the criminal process unworkable. It is extremely common for criminal defendants not to testify, and there are good reasons for this, as we have seen. Yet it is simple enough after being convicted for the defendant to say, "My lawyer wouldn't let me testify. Therefore I'm entitled to a new trial." That's what Underwood did. His affidavit, which is the only evidence bearing on the

question, states, so far as pertinent here, "I was denied
the opportunity to testify at my own trial in that I told
my attorney that I wished to testify on my own behalf.
My attorney told me I could not testify."

We agree with the First Circuit's ruling in <u>Siciliano
v. Vose</u>, 834 F.2d 29, 31 (1st Cir.1987), that this
barebones assertion by a defendant, albeit made under
oath, is insufficient to require a hearing or other
action on his claim that his right to testify in his own
defense was denied him.  It just is too facile a tactic
to be allowed to succeed.  Some greater particularity is
necessary-and also we think some substantiation is
necessary, such as an affidavit from the lawyer who
allegedly forbade his client to testify-to give the claim
sufficient credibility to warrant a further investment of
judicial resources in determining the truth of the claim.

<u>Underwood</u>, 939 F.2d at 475-76.[38]

Additionally, it is well-established that a petitioner's
denial of his right to testify is subject to "harmless error"
analysis.  <u>Bell v. Quarterman</u>, 330 Fed. Appx. 492, 493, 2009 WL
2391575, *1 (5th Cir.) (<u>per</u> <u>curiam</u> ), <u>cert</u>. <u>denied</u>, ___ U.S. ___,
130 S.Ct. 805 (2009) (affirmed district court's application of
harmless error standard to petitioner's claim that he was denied
his right to testify); <u>Graham v. Roberts</u>, 96 F.3d 1445 (5th Cir.

---

[38]Parks asserts that the <u>Martinez</u> Court "seemed to infer that
an evidentiary hearing" is warranted so that a petitioner may
uncover facts supporting his ineffectiveness claim.  Rec. Doc. 14,
p. 8.  A reading of <u>Martinez</u>, 132 S.Ct. at 1317, reflects that the
Court provided: "While confined to a prison, the prisoner is in no
position to develop the evidentiary basis for a claim of
ineffective assistance, <u>which often turns on evidence outside the
trial record</u> [emphasis added]."  In this case, the basis of Parks'
claim is that counsel refused to allow him to testify at trial.
Such a claim, rather than turning on evidence outside the trial
record, clearly turned on events in the trial, events Parks was
well aware of at the time of his direct appeal.

1996) (<u>per</u> <u>curiam</u>) (assuming that petitioner's right to testify was denied, it was harmless error).

As noted above, the evidence against Parks was substantial. Parks offers no explanation as to what his testimony would have been to counter the above-described evidence establishing his guilt. Accordingly, even if the Court were to believe that counsel told Parks he could not testify at trial, the Court finds that the denial of Parks' right to testify was harmless error.

Based upon the above, the Court finds that Parks has failed to overcome the procedural default of his claim that counsel denied him his right to testify at trial. Parks has not shown the requisite prejudice.

### FUNDAMENTAL MISCARRIAGE OF JUSTICE

Parks may avoid this procedural bar only if a fundamental miscarriage of justice will occur if the merits of his claims are not reviewed. <u>Hoque</u>, 131 F.3d 466, 497 (5th Cir. 1997) (citing <u>Sawyer v. Whitley</u>, 505 U.S. 333, 339 (1992)), <u>cert</u>. <u>denied</u>, 523 U.S. 1014 (1998). To establish a fundamental miscarriage of justice, Parks must provide this Court with evidence that would support a "colorable showing of factual innocence." <u>Kuhlmann v. Wilson</u>, 477 U.S. 436, 454 (1986); <u>accord</u> <u>Murray</u>, 477 U.S. at 496; <u>Glover</u>, 128 F.3d at 902. To satisfy the factual innocence standard, Parks must establish a fair probability that, considering all of the evidence now available, the trier of fact would have

26

entertained a reasonable doubt as to his guilt. <u>Campos v. Johnson</u>, 958 F.Supp. 1180, 1195 (W.D.Tex. 3/21/97) (footnote omitted); <u>Nobles</u>, 127 F.3d at 423 n. 33 (actual innocence factor requires a showing by clear and convincing evidence that "but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.")  When the petitioner has not adequately asserted his actual innocence, his procedural default cannot be excused under the "fundamental miscarriage of justice" exception.  <u>Glover</u>, 128 F.3d at 903.

Parks does not present any evidence and the record contains nothing that suggests his actual innocence on the underlying conviction.  He fails to present any evidence or argument of actual innocence.  For these reasons, Parks has failed to overcome the procedural bar to his insufficiency of evidence claim (claim 4) and his claim that counsel refused to allow him to testify on his own behalf (claim 5).  These claims are procedurally barred and must be dismissed with prejudice for that reason.

**TRIAL COURT ERRED IN DENYING HIS MOTION IN LIMINE SEEKING TO EXCLUDE INADMISSIBLE HEARSAY**

Parks asserts that the trial court erred in denying his motion in limine to exclude inadmissible hearsay.  Specifically, the court should have excluded the victim's out-of-court statements.

A federal court does "not sit as [a] 'super' state supreme court in a habeas corpus proceeding to review errors under state law."  <u>Wilkerson v. Whitley</u>, 16 F.3d 64, 67 (5th Cir.1994)

27

(quotation omitted); <u>see also</u> <u>Swarthout v. Cooke</u>, ___ U.S. ___, 131
S.Ct. 859, 861 (2011) (federal habeas review does not lie for
errors of state law); <u>accord</u> <u>Molo v. Johnson</u>, 207 F.3d 773, 776 n.
9 (5th Cir.2000); <u>Narvaiz v. Johnson</u>, 134 F.3d 688, 695 (5th Cir.
1998) (citing <u>Estelle v. McGuire</u>, 502 U.S. 62, 67–68 (1991)); <u>Lewis
v. Jeffers</u>, 497 U.S. 764, 780 (1990); <u>West v. Johnson</u>, 92 F.3d
1385, 1404 (5th Cir.1996)); <u>see also</u> <u>Hoque</u>, 131 F.3d at 506. (5th
Cir.1997) (a disagreement as to state law is not cognizable on
federal habeas review). Habeas corpus review is limited to
questions of constitutional dimension, and federal courts generally
do not review the admissibility of evidence under state law.
<u>Estelle</u>, 502 U.S. at 67–68; <u>Gonzales v. Thaler</u>, 643 F.3d 425, 429
(5th Cir.2011); <u>Jernigan v. Collins</u>, 980 F.2d 292, 298 (5th
Cir.1992).

Thus, the states are free to implement procedures regarding
the admission and/or exclusion of evidence, provided those
procedures do not infringe on a constitutional guarantee. <u>Burgett
v. Texas</u>, 389 U.S. 109, 113–14 (1967); <u>Williams v. Price</u>, 343 F.3d
223, 230 n. 3 (3rd Cir. 2003); <u>Pemberton v. Collins</u>, 991 F.2d 1218,
1223 (5th Cir. 1993); <u>Nees v. Culbertson</u>, 406 F.2d 621, 625 (5th
Cir. 1969); <u>Tillman v. Thaler</u>, 2010 WL 2731762, *13 (W.D.Tex.
7/9/10). Parks' claims that the trial court erred in denying his
motion to exclude inadmissible hearsay may warrant federal habeas
corpus relief only if the state court evidentiary ruling violates

28

due process in such a way as to render Parks' criminal proceedings fundamentally unfair. Lisenba v. California, 314 U.S. 219, 236-37 (1941); Gonzales v. Thaler, 643 F.3d 425, 430 (5th Cir. 2011); see Peters v. Whitley, 942 F.2d 937, 940 (5th Cir. 1991) (habeas corpus review is proper only to determine whether a state trial judge's error is so extreme as "to render the trial fundamentally unfair or violate an explicit constitutional right"). Federal habeas corpus relief may be granted on erroneous state evidentiary rulings only if the evidence at issue is "a crucial, critical, or highly significant factor in the context of the entire trial." Thomas v. Lynaugh, 812 F.2d 225, 230 (5th Cir. 1987) (citations omitted); accord Gonzales, 643 F.3d at 430; Wood v. Quarterman, 503 F.3d 408, 414 (5th Cir. 2007).

The question of whether evidence is constitutionally admitted or excluded is a mixed question of law and fact. Livingston v. Johnson, 107 F.3d 297, 309 (5th Cir.), cert. denied, 522 U.S. 880 (1997); Tyson v. Trigg, 883 F.Supp. 1213, 1218 (S.D.Ind. 9/6/94) aff'd, 50 F.3d 436 (7th Cir. 1995), cert. denied, 516 U.S. 1041 (1996). Under the applicable standard of review, this Court therefore must determine whether the state courts' decisions are contrary to or involve an unreasonable application of Supreme Court precedent.

Parks argues that the statements the victim made over the telephone to her niece, Desmarie Johnson, were hearsay and should

have been excluded.   In support, Parks asserts that the statements were inadmissible under state law because they did not fall under any exceptions to the hearsay rule.[39]

In addressing the instant issue on direct appeal, the Louisiana Fifth Circuit reviewed the statements at issue as presented in Desmarie Johnson's testimony.

> At trial, Ms. Johnson testified that, on May 4, 2006, at 11:14 p.m., Mrs. White called her on her cell phone. Mrs. White was crying and her voice was "very shaky." Ms. Johnson believed that she was afraid.  Mrs. White told Ms. Johnson that defendant "brought this woman to my house—in my house and you know, nobody's going to treat me like that." Mrs. White also told Mr. Johnson, "And he told me that if there is any sh*t in the house tonight that he had a gun." Mrs. White also said with a sense of urgency in her voice, "Please, come and be with me.  Come right now."  Afterwards, Mrs. White hung up the phone without saying goodbye.  Ms. Johnson testified that Mrs. White was scared, and that she had never heard Mrs. White sound so upset.

Parks, 2 So.3d at 476.

As the Louisiana Fifth Circuit explained, "[h]earsay is an oral or written assertion, other than one made by the declarant while testifying at the present trial, offered to prove the truth of the matter stated."   Parks, So.2d at 476 (citation omitted). While Ms. Johnson's testimony as to what the victim told her was clearly hearsay, the trial court found the victim's statements admissible "under the 'state of mind' exception to the hearsay rule" as provided for under La. Code of Evidence Article 803(3).

---

[39]Rec. Doc. No. 5-1, pp. 13-16.

<u>Id</u>. at 476-77.  The Louisiana Fifth Circuit agreed, concluding that the statements were properly admitted.  <u>Id</u>. at 477.

As noted above, it is not the province of this Court to review the admissibility of evidence under state law.  An alleged error in a state evidentiary ruling may warrant habeas relief only if the ruling violates due process in such a way that Parks was denied a fundamentally fair trial.  As shown below, Johnson's testimony as to what the victim stated was far from the only evidence submitted in support of the jury's guilty verdict.

Expert testimony was offered that contrary to Parks' statements to police, the victim's death was a homicide, rather than a suicide or an accidental death resulting from a struggle over the gun.  Dr. Susan Garcia, an expert forensic pathologist, testified that "the cause and manner of death was a homicide" and that the victim's "wound was not consistent with someone struggling over a weapon."  <u>Id</u>. at 473.

Jefferson Parish Detective Jeffery Rodrigue testified that a search of the victim's house uncovered one round of Winchester .38 caliber ammunition in the bedroom Parks occupied before moving to the FEMA trailer.  A search of the FEMA trailer uncovered a box of Winchester .38 special ammunition.  <u>Id</u>.

Leopold Sher, an attorney, testified that he hired workmen, two of which were Parks and Brown, to repair storm damage to his father's home.  Contained in the home was a yellow box of bullets

31

and a .38 Smith and Wesson Combat Masterpiece revolver.  Sher testified that following the work he could not find the box of bullets or the gun.  Sher identified the box of ammunition found in Parks' trailer "as very similar to his box."  <u>Id</u>.[40]

Louise Walzer, a firearms expert, testified that projectiles recovered from the victim and from a sofa in the home were .38 caliber ammunition.  She stated that the projectiles could have been fired from a Smith and Wesson Combat Masterpiece.  <u>Id</u>.

Milton Brown testified that while working in the Sher home he saw a handgun in a pouch in a dresser drawer.  Brown told Parks about the gun and, two days later, he saw Parks with the gun in their apartment.  <u>Id</u>. at 473-74.

Based upon the above, it cannot be concluded that the admission of Johnson's testimony regarding the telephone call she received from the victim was so crucial or highly significant that it resulted in fundamentally unfair proceedings.

Parks also claims that he was denied his Sixth Amendment rights under the Confrontation Clause by virtue of the admission of the victim's statements.  The Sixth Amendment of the United States Constitution guarantees an accused in a criminal proceeding the right to confront the witnesses against him.

In <u>Ohio v. Roberts</u>, 448 U.S. 56, 66 (1980), the Supreme Court determined that a hearsay statement was not violative of the

---

[40]The gun was never recovered.

Confrontation Clause if the declarant was unavailable and the declarant's statement fell "within a firmly rooted hearsay exception." As the victim's statements fell under the firmly rooted "state of mind" hearsay exception, under <u>Roberts</u>, the victim's statements were clearly admissible.

In <u>Crawford v. Washington</u>, 541 U.S. 36 (2004), the Supreme Court overruled <u>Roberts</u> with regard to <u>testimonial</u> statements. The Court provided that when <u>testimonial</u> evidence is at issue, said evidence is inadmissible as violative of the Confrontation Clause unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant. <u>Id</u>. at 68. Because Parks did not have a prior opportunity to cross-examine the victim, he asserts that the admission of the victim's statements were violative of his right to confront his accuser.

As noted above, the ruling in <u>Crawford</u> is limited to testimonial statements. Thus, the issue at hand is whether the victim's statements were testimonial. In resolving this issue, the Louisiana Fifth Circuit reasoned:

> While the Supreme Court specifically declined to define "testimonial," it recognized that, at a minimum testimonial statements include: "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and police interrogations." <u>State v. Leonard</u>, 05-42, p. 19 (La. App. 5 Cir. 7/26/05), 910 So.2d 977, 989, citing <u>Crawford</u>, <u>supra</u>, 124 S.Ct. at 1374. The <u>Crawford</u> Court stated that "testimony" is "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." <u>State v. Leonard</u>, 05-42 at 19-20, 910 So.2d at 989, citing <u>Crawford</u>, <u>supra</u>,

>124 S.Ct. at 1364. According to the Supreme Court, an
>accuser making a formal statement to government officials
>bears testimony in a sense that a person making a casual
>remark to an acquaintance does not. Id. As examples of
>testimonial statements, the Crawford Court lists
>affidavits, custodial examinations, depositions, prior
>testimony, confessions, or similar pretrial statements
>that declarants would reasonably expect to be used in a
>prosecution. The Supreme Court also refers to statements
>that were made under circumstances that would lead an
>objective witness reasonably to believe that the
>statement would be available for use at a later trial.
>State v. Leonard, 05-42 at 20, 910 So.2d at 989-90 citing
>Crawford, supra, 124 S.Ct. at 1364.

Parks, 2 So.3d at 478.

Based upon the above, the state appellate court properly
concluded that the victim's statements to her niece were not
testimonial, reasoning:

>The statements do not come within the purview of any of
>the classes of testimonial statements mentioned in
>Crawford. The victim was speaking to a friend, and not
>the police. Additionally, the victim had no expectation
>that her statement would be of later use to help
>establish that defendant committed a crime, as she spoke
>informally and without coercion.

Id. at 479 (citations omitted).

The Court finds Parks' claim, that his right to confront his
accusers was violated by virtue of the admission of the victim's
statements, is without merit. The state courts' rejection of
Parks' claim does not represent an unreasonable application of
Supreme Court precedent to the facts of this case.

**TRIAL COURT ERRED IN DENYING PARKS' MOTION TO SUPPRESS STATEMENTS**

Parks argues that his statements to police should have been
suppressed. Parks states that he requested that an attorney be

present during police questioning, but his "request was refused" and officials continued to question him.[41]

Once a defendant requests an attorney, police are prohibited from questioning him until counsel is present unless the defendant initiates further communication. <u>Miranda v. Arizona</u>, 384 U.S. 436, 469 (1966); <u>Edwards v. Arizona</u>, 451 U.S. 477, 484-85 (1981). However, to trigger the protection afforded under <u>Miranda</u> and <u>Edwards</u>, the request for counsel must be unequivocal.

> We held in <u>Miranda</u> that a suspect is entitled to the assistance of counsel during custodial interrogation even though the Constitution does not provide for such assistance. We held in <u>Edwards</u> that if the suspect invokes the right to counsel at any time, the police must immediately cease questioning him until an attorney is present. But we are unwilling to create a third layer of prophylaxis to prevent police questioning when the suspect might want a lawyer. <u>Unless the suspect actually requests an attorney, questioning may continue</u>.

<u>Davis v. United States</u>, 512 U.S. 452, 462 (1994) (emphasis added).

Parks provided three conflicting statements to police.[42] One to Officer Morales, another to Officers Morales and Klein, and a third to Officer Klein.[43]

---

[41]Rec. Doc. No. 5-1, p. 19.

[42]The content of Parks' statements are set forth in the Louisiana Fifth Circuit's recitation of the facts. <u>See</u> <u>supra</u> at pp. 9-11.

[43]St. Rec. Vol. 8 of 8, tabs 17, 18 and 19.

A review of the recordings of Parks' statements shows that he never requested counsel.  His first statement to Detective Morales reflects, in pertinent part, the following colloquy:

> MORALES: [U]h, I advised you that I was handling a, a murder investigation.  Is that correct?
> PARKS: Yes, sir.
> MORALES: And I advised before I ... could talk to you I had to advise you of your, uh, of your <u>Miranda</u> Rights.
> PARKS: Yes, sir.  You did....
> MORALES: Okay. I'm uh, ... gonna go over 'em again....
> MORALES: Okay.  You advised me you can read and write.
> PARKS: Yes, sir.
> MORALES:  And  again,  I  advised  you  this  was  an investigation relative to uh, First Degree Murder?
> PARKS: Huh ... Yes, sir....
> MORALES: [B]efore we ask you any questions you must understand your rights.  You have the right to remain silent.  Anything you say can and will be used against you in court.  You have the right to talk with a lawyer for advice before we ask you any questions and to have him with you during questioning.  If you cannot afford a lawyer one will be appointed for you before any questions if you wish.  If you decide to answer questions now without a lawyer present you will still have the right to stop answering at any time until you talk to a lawyer. Did I read you those <u>Miranda</u> Rights to you?
> PARKS: Yes, sir.
> MORALES: Okay.  Did you also read 'em yourself and initial each w-, each of the rights?
> PARKS: Yes.  I did.
> MORALES: And is that your signature that you have uh, read these uh, your rights?
> PARKS: Yes, sir.  It is.
> MORALES: Okay.  And then I cover the, the waiver at the bottom.  I said this was a very important part, the Waiver of Rights.
> PARKS: Yes.
> MORALES: And I understand what my rights are.  I am willing to make a statement and answer questions.  I do not want a lawyer at this time.  I understand and know what I am doing.  No promises or threats have been made to me and no pressure or coercion, of any kind, has been used against me.  And do you sign your, your name there ....
> PARKS: Yes, sir.

MORALES: [A]nd agree to waive your right and, and answer
my questions?
PARKS: Yes, sir.[44]

Parks' second statement to Detective Morales and Sergeant

Klein reflects, in pertinent part, the following:

Ques. Uh, Mr. Parks earlier today I-I-I advised you of
your rights on a Rights form, is that correct?
Ans. Yes....
Ques. Okay. And - and, uh, advised you that there was an
investigation relative to First Degree Murder.
Ans. Yes.
Ques. And did you read each one of these rights, and did
I read each one to you?
Ans. Yes.
Ques. And is that your initials by each one of them?
Ans. Yes it is.
Ques. Okay. And then there - this is the bottom part ...
the Waiver, and did I, uh, also, uh, read this Waiver of
Rights, and you agreed to talk to us without the presence
of an attorney?
Ans. Yes.[45]

Thereafter, the questioner explained, without objection from

Parks, that they were taking a second statement because Parks had

advised that originally he did not "tell us the complete truth, and

you want to tell us the truth now."[46]  Parks proceeded to tell his

story but became confused with respect to the sequence of events.

Parks advised that he was "getting confused," but continued with

his account of the incident.[47]  Shortly thereafter, Parks again

---

[44]St. Rec. Vol. 8 of 8, tab 17, pp. 1-3.

[45]St. Rec. Vol. 8 of 8, tab 18, p. 1.

[46]St. Rec. Vol. 8 of 8, tab 18, p. 2.

[47]St. Rec. Vol. 8 of 8, tab 18, p. 2.

37

stated: "I'm confused" and advised: "I can't do this right now."[48]
In response, the following colloquy took place.

       Ques: (Sgt. E. Klein) That is okay.
       Ans:  No, stop that right now, I'm confused.
       Ques: Okay.  This statement is, uh, ended at-
       Ans: (Inaudible, squeaking chair).
       Ques: Okay, it is up to you sir, just hold on a second.[49]

Immediately thereafter Parks continued to provide his version of
events.[50]

       Approximately  two  hours  later,[51]  Parks  provided  a  third
statement  to  Sergeant  Klein.    Before  proceeding  with  his
questioning, Sergeant Klein confirmed that Parks was aware of his
rights.

       Ques. Okay. And this is going to be your third statement?
       Ans.  Yes.
       Ques. Okay.  And this is the Right form that [you] filled
       out before you[r] first statement, is that correct?
       Ans.  Yes it is.
       Ques. Do you still understand your rights?
       Ans.  Yes.[52]

       Based upon the above, it is clear that Parks' suffered no
constitutional infringement.  Parks never stated, unequivocally or
otherwise, that he desired to have counsel present.  His statements

------

[48]St. Rec. Vol. 8 of 8, tab 18, p. 2.

[49]St. Rec. Vol. 8 of 8, tab 18, p. 2.

[50]St. Rec. Vol. 8 of 8, tab 18, pp. 2-8.

[51]The second statement was completed at 5:41 AM.  St. Rec. Vol.
8 of 8, tab 18, p. 8.  The third statement commenced at 7:56 AM.
St. Rec. Vol. 8 of 8, tab 19, p. 1.

[52]St. Rec. Vol. 8 of 8, tab 19, p. 1.

were not involuntary and the state courts' rejection of the instant claim does not constitute a violation of Supreme Court precedent to the facts of this case.

## APPELLATE REVIEW AND COMPLETE TRANSCRIPT

Parks argues that his constitutional rights were violated when he was not provided with the necessary transcripts "when he filed his post-conviction relief application [emphasis added]."[53] According to Parks, he required the transcripts to support the following claims: 1) the State used too many peremptory challenges; 2) African-Americans were improperly excluded from the jury; 3) the evidence was insufficient to support his conviction; 4) hearsay evidence was improperly admitted; 5)counsel refused to allow him to testify; and, 6) trial counsel was ineffective.[54]

On direct appeal, an indigent criminal defendant has an absolute right to a trial transcript, or an alternative device that fulfills the same function. Griffin v. Illinois, 351 U.S. 12, 18-20 (1956). There is no question that a trial transcript was provided in connection with Parks' direct appeal. Appellate counsel made several references to the trial transcript in the brief filed on Parks' behalf.[55]

---

[53]Rec. Doc. No. 5-1, p. 21.

[54]Rec. Doc. No. 5-1, pp. 21-22.

[55]A copy of Parks' appellate brief is contained in St. Rec. Vol. 5 of 8, tab 11.

On collateral review, however, an indigent criminal defendant does <u>not</u> have an absolute right to a transcript. Instead, a petitioner must show a need for the transcript. <u>Smith v. Beto</u>, 472 F.2d 164, 165 (5th Cir. 1973) (no constitutional violation; petitioner did not show he had a need for a transcript in pursuing his post-conviction remedies in state court). A petitioner must demonstrate that the claims he seeks to raise are not frivolous. <u>Ruark v. Gunter</u>, 958 F.2d 318, 319 (10th Cir. 1992) (<u>per curiam</u>) (citing <u>United States v. MacCollom</u>, 426 U.S. 317 (1976)) (petitioner seeking collateral relief must demonstrate that his claims are not frivolous before he is entitled to a free transcript).

On post-conviction, the state district court rejected the instant claim, finding that Parks had failed to show a "particular need" for the transcript, a showing which requires "more than a mere statement that he wishes to comb the record for errors or a general statement that a right has been violated."[56] The state appellate court affirmed the district court's finding, determining that Parks had failed to demonstrate a "particularized need" for the records. <u>State ex rel. Parks v. State</u>, No. 2010-KH-358 (La. App. 5 Cir. 5/7/10) (unpublished opinion).[57]

---

[56]St. Rec. Vol. 2 of 8, tab 7.

[57]A copy of the appellate court opinion is contained in St. Rec. Vol. 2 of 8, tab 8. The Louisiana Supreme Court denied Parks' writ application without opinion. <u>State ex rel. Parks v. State</u>, 69

With regard to his claim that African-Americans were improperly excluded from the jury, Parks offers no specifics. He merely states that he needs the trial transcript in order to substantiate his allegation,[58] i.e., in order to comb through the record to try to find support for his challenge to the jury voir dire.

Parks' claim that the State used too many peremptory challenges is frivolous as it is not true. Under La.C.Cr.P. art. 799, the State was entitled to 12 peremptory challenges. The State only used seven of its peremptory challenges.[59]

Parks' argument that he needed the trial transcript to challenge the improper admission of hearsay evidence is also frivolous. Said claim was raised on appeal and the transcript was utilized to support the claim.[60]

Parks provides no argument to support his claim that he needed the trial transcript to properly argue that counsel refused to allow him to testify. In raising the claim before this Court, Parks makes no mention of needing the trial transcript. Instead, Parks argues that he needs an evidentiary hearing which would allow

---

So.3d 1134 (La. 2011).

[58]Rec. Doc. No. 5-1, p. 22.

[59]St. Rec. Vol. 3 of 8, pp. 16-17.

[60]St. Rec. Vol. 5 of 8, tab 11.

him "to subpoena his trial counsel and question him regarding this claim."[61]

Parks has failed to satisfy his burden of proof regarding his alleged need for a transcript to support his insufficiency of evidence claim and ineffective assistance of trial counsel claim. This Court, having reviewed the trial transcript, found "more than sufficient evidence to support Parks' conviction."[62] Further, Parks makes no showing as to how his ineffectiveness claims, discussed below, would have been rendered viable if he had had access to a "complete" transcript.

Accordingly, the Court finds that the state courts' rejection of the instant claim is not contrary to Supreme Court precedent.

**INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL**

Parks argues that trial counsel was ineffective due to his failure to have Parks' statements suppressed.  Parks asserts that his statements were inadmissible because they were acquired pursuant to an unlawful arrest and after he requested counsel.

A criminal defendant has a right to effective assistance of counsel.  The standard for judging performance of counsel was established by the United States Supreme Court in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), in which the Supreme Court established a two-part test for evaluating claims of ineffective

---

[61]Rec. Doc. No. 5-1, p. 33.

[62]<u>See</u> <u>supra</u> at pp. 21-23.

42

assistance of counsel, requiring petitioner to prove both deficient performance and resulting prejudice. Strickland, 466 U.S. at 697. The Supreme Court first held that "the defendant must show that counsel's representation fell below an objective standard of reasonableness." Id. at 687-88. Second, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694; United States v. Kimler, 167 F.3d 889, 893 (5th Cir.1999).

In deciding ineffective assistance of counsel claims, this court need not address both prongs of the conjunctive Strickland standard, but may dispose of such a claim based solely on a petitioner's failure to meet either prong of the test. Kimler, 167 F.3d at 893. A habeas corpus petitioner "need not show that 'counsel's deficient conduct more likely than not altered the outcome in the case.' It is not enough under Strickland, however, 'that the errors had some conceivable effect on the outcome of the proceeding.'" Motley v. Collins, 18 F.3d 1223, 1226 (5th Cir.1994) (quoting Strickland, 466 U.S. at 693).

On habeas review, the United States Supreme Court has recently clarified that, under Strickland, "[t]he question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." Harrington v. Richter, ____ U.S. ____, 131

43

S.Ct. 770, 788 (2011). The Harrington Court went on to recognize the high level of deference owed to a state court's findings under Strickland in light of the AEDPA:

> The standards created by Strickland and §2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so. The Strickland standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under §2254(d). When §2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

"A court must indulge a 'strong presumption' that counsel's conduct falls within the wide range of reasonable professional assistance because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight." Bell v. Cone, 535 U.S. 685, 697 (2002) (citing Strickland, 466 U.S. at 689). This Court must apply the "strong presumption" to counsel's strategy and tactical decisions which fall "within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 690. A "'conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness.'" Johnson v. Dretke, 394 F.3d 332, 337 (5th Cir.2004) (quoting United States v. Jones, 287 F.3d 325, 331 (5th Cir.2002)); see also Jones, 287 F.3d at 331 ("Informed strategic decisions of

44

counsel are given a heavy measure of deference and should not be second guessed." (quotation omitted)); Geiger v. Cain, 540 F.3d 303, 309 (5th Cir.2008) (same).  Federal habeas courts presume that trial strategy is objectively reasonable unless clearly proven otherwise.  Strickland, 466 U.S. at 689; Moore, 194 F.3d at 591.

The issue of ineffective assistance of counsel is a mixed question of law and fact.  Woodfox v. Cain, 609 F.3d 774, 789 (5th Cir.2010); Richards v. Quarterman, 566 F.3d 553, 561 (5th Cir. 2009).  The question before this Court is whether the state courts' denial of relief was contrary to or an unreasonable application of United States Supreme Court precedent.

Parks claims that he requested that an attorney be present during police questioning, but his request was denied and officials continued to question him.  As discussed above, once a defendant requests an attorney, police are prohibited from questioning him until counsel is present unless the defendant initiates further communication.  Miranda, 384 U.S. at 469; Edwards, 451 U.S. at 484-85 (1981). However, there is no evidence that Parks requested an attorney.  He was advised of his Miranda rights repeatedly, including his right to have an attorney.  The transcripts of the recordings of his statements reflect that he never requested an attorney.[63]  Thus, counsel was not deficient in failing to have

---

[63]See discussion supra at pp. 34-38.

Parks' statements suppressed based upon the claim that the statements were taken despite Parks' request for counsel.

Parks also claims that he was transported to the police station in handcuffs and interrogated while shackled to a ring secured to the floor. Parks asserts that the action of the police in this regard amounted to an arrest. Because the police lacked probable cause, the arrest was illegal and the statements resulting from the arrest should have been suppressed.[64]

"A seizure of the person within the meaning of the Fourth and Fourteenth Amendments occurs when, 'taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" Kaupp v. Texas, 538 U.S. 626, 629 (2003) (quoting Florida v. Bostick, 501 U.S. 429, 437 (1991) (additional quotation omitted)). "Detentions may be 'investigative' yet violative of the Fourth Amendment absent probable cause." Florida v. Royer, 460 U.S. 491, 499 (1983) (plurality decision). Police may not "seek to verify their suspicions by means that approach the conditions of arrest." Id.

A review of Parks' motion to suppress transcript reflects that Detective Morales testified that Parks voluntarily came to the "Detective Bureau" for questioning and that Parks was not under

---

[64]Rec. Doc. 5-1, pp. 37-39.

arrest, but rather, was merely "a person of interest."[65]  If Parks, in fact, was taken away in handcuffs and interrogated while shackled to the floor, such actions could constitute an arrest, triggering Fourth Amendment protection.  However, Parks provides no evidence to support his claim that he was handcuffed and shackled. Nor does he offer any evidence, or even an allegation, that he conveyed this information to counsel.  Absent some evidence, such as an affidavit from counsel attesting that Parks provided him with the alleged facts (that he was handcuffed and shacked) and counsel failed to bring these facts to the trial court's attention, Parks' claim cannot stand.  As observed above, in the context of an unsubstantiated claim that Parks told counsel he wanted to testify and counsel did not abide by his request, a habeas petitioner cannot prevail merely by saying that he told his counsel something and counsel did not follow up on the information.[66]  It is simple enough for Parks to say he gave counsel information which may have warranted a suppression of evidence but counsel failed to utilize the information.  However, such a "barebones assertion" is just "too facile a tactic to be allowed to succeed."  Underwood, 939 F.2d at 475-76.

Accordingly, the Court finds that Parks has failed to satisfy his burden of proving counsel was ineffective in failing to get his

---

[65]St. Rec. Vol. 3 of 8, pp. 95 and 104.

[66]See discussion supra at pp. 23-25.

statements suppressed based upon the claim that the statements were obtained pursuant to an unlawful arrest in violation of the Fourth Amendment.  Parks is not entitled to habeas relief.

Further, assuming arguendo that Parks was placed in handcuffs and involuntarily taken to the police station, such action was not unlawful as probable cause existed to support Parks' arrest.  When police arrived on the scene, they found a dead body and the victim's niece informing that the victim had telephoned her minutes earlier and said that Parks had threatened her.  The police had probable cause, thereby justifying a warrantless arrest.  James v. Dallas Police Dept.  499 Fed. Appx 329 (5th Cir. 2012) (citing Deville v. Marcantel, 567 F.3d 156, 165 (5th Cir. 2009) (officer may conduct warrantless arrest based on probable cause).

Due to the existence of probable cause, it would have been futile for counsel to raise a suppression argument based upon the theory that Parks was unlawfully arrested.  Counsel cannot be ineffective for failing to pursue a futile course of action. United States v. Manley, 2011 WL 2259761, *3 (E.D. Pa. 2011); see Lindsey v. Cain, 267 Fed. Appx. 374, *1 (5th Cir. 2008) (counsel is not ineffective by failing to raise revolous or futile claims) (citing Johnson v. Cockrell, 306 F.3d 249, 255 (5th Cir. 2002)).

Parks next argues that counsel was ineffective because he failed to perform a pre-trial investigation and failed to interview witnesses.  Specifically, Parks claims that counsel was ineffective

48

in failing to interview Julie Hamilton, "the only other witness who was present at the crime scene."[67]

At trial, the State submitted into evidence a "Proof of Death document" signed by Dr. Robert Treuting, the Coroner of Jefferson Parish, which attested: "Julie Hamilton; Date of Birth: 1/22/62; Date of Death: 6/2/06, 5:29 P.M. [Emphasis added]."[68]  Trial counsel was not appointed to represent Parks until July 7, 2006, over a month after Hamilton's death.[69]  Based upon the fact that Hamilton died before counsel was appointed to represent Parks, his representation can hardly be deemed ineffective based upon his failure to interview Hamilton.

Additionally, complaints of uncalled witnesses are not favored on habeas review because allegations of what a witness would have testified to are "largely speculative."  Graves v. Cockrell, 351 F.3d 143, 156 (5th Cir. 2003) (quotation omitted).  A review of the statement Julie Hamilton provided to police reflects that contrary to Parks' assertion, her testimony would not have been particularly helpful to the defense.  Hamilton stated that she stayed in the trailer during the incident and did not know what occurred. However, she informed that Parks stated he was going to get a

_____

[67]Rec. Doc. No. 5-1, p. 42.

[68]Hamilton's cause of death was lupus and manner of death was natural.  St. Rec. Vol. 4 of 8, p. 465.

[69]St. Rec. Vol. 3 of 8, p. 25.

DVD/VCR player from the victim's house, but he came back to the trailer empty handed, stating that the victim refused to let him have the player.  Later, Parks returned to the house to once again try to get the player and this time he got it, offering no explanation as to how he was able to get it from the victim the second time.[70]

Parks also claims counsel was ineffective because he informed Parks "that he inquired into the phone records of the victim and that his source at the phone company told him there was [sic] no calls placed from the victim's residence within the time frame alleged by the state."[71]  Parks states that counsel, armed with this information, failed to argue that the victim's statements, via her alleged telephone conversation with Desmarie Johnson, were inadmissible because the conversation never occurred.

Parks' incredible claim in this regard, much like his claim that he informed counsel that he was handcuffed and shackled and counsel failed to present this information to the trial court, is unsupported by any evidence.  Parks' barebones assertion is insufficient to satisfy his burden of proof.

**INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL**

Parks asserts that appellate counsel was ineffective because he failed to adequately peruse the state record.  In support, Parks

---

[70]St. Rec. Vol. 2 of 8, tab 6.

[71]Rec. Doc. No. 5-1, p. 48.

points to the fact that counsel argued that Parks' statements
should be suppressed based upon Parks' alleged unlawful arrest.
The Louisiana Fourth Circuit however, on direct appeal, refused to
consider the issue because it was not raised at trial.  Parks, 2
So.3d at 480.  This proves, according to Parks, that counsel failed
to review the record.   Parks also questions whether the
"transcripts concerning the suppression issue [were] made a part of
the record that appeal counsel reviewed."[72]  Though confusing, Parks
appears to argue that based upon the alleged lack of the
suppression transcript, there was not a complete record and, as
appellate counsel was not trial counsel, the lack of this record
denied him effective assistance of counsel on appeal.

    In order to prove prejudice with respect to appellate counsel,
a petitioner must show a reasonable probability that he would have
prevailed on appeal but for his counsel's deficient representation.
Briseno v. Cockrell, 274 F.3d 204, 207 (5th Cir.2001); see also
Smith v. Robbins, 528 U.S. 259, 286 (2000).   Therefore, a
petitioner must demonstrate a reasonable probability that, if
appellate counsel's performance had not been deficient in the
manner claimed, the appellate court would have vacated or reversed
the trial court judgment based on the alleged error.  Briseno, 274
F.3d at 210.

---

[72]Rec. Doc. No. 5-1, p. 51.

A review of the brief filed by appellate counsel on Parks'
behalf dispels the notion that the transcript from Parks's motion
to suppress was not made part of the record.   In his supporting
memorandum, appellate counsel made several references to the
suppression transcript.[73]   Further, in his brief appellate counsel
offered a thorough argument as to why the manner of Parks'
transport and interrogation constituted an illegal arrest and, as
such, the statements resulting from the arrest should have been
suppressed.[74]

A review of the record reflects that trial counsel's written
motion to suppress contained only a general assertion that Parks'
statements should be suppressed because they were the result of
coercive action on the part of police.   As the Louisiana Fifth
Circuit noted, trial counsel, in his written motion, argued that
Parks' statements should be suppressed because:

> They were not made to police officers or to anyone else
> freely and voluntarily, but were made under the influence
> of fear, intimidation, threats or other duress, or
> because of promises or other inducements; and/or
>
> Defendant had not been advised of his rights under
> Miranda, or had invoked his right to remain silent or to
> have an attorney and this right had not been honored.

---

[73]St. Rec. Vol. 5 of 8, tab 11, pp. 12, 15.

[74]Interestingly, appellate counsel relied on case law,
specifically Florida v. Royer, 460 U.S. 491 (1983), which this
Court cited in connection with its discussion of Parks' claim that
his interrogation constituted an illegal arrest and therefore his
statements should have been suppressed.  See supra at p. 46.  See
also St. Rec. Vol. 5 of 8, tab 11, p. 14.

Parks, 2 So.2d at 480.

The determination that the above general allegation did not encompass the claim raised on appeal, that Parks' statements should be suppressed because the police's coercive actions amounted to an illegal arrest, is far from clear. Certainly, Parks' argument, that appellate counsel had not reviewed the record because he failed to recognize the claim had not been raised at trial, is without merit. Quite frankly, appellate counsel may have been deficient if he had not raised the claim. However, regardless of whether counsel was deficient, Parks' ineffectiveness claim is without merit because he has failed to show that he was prejudiced by counsel's alleged deficiency. The argument was brought before the state courts on post-conviction and was denied on the merits.[75] Thus, Parks has failed to satisfy his burden of proof. The state courts' denial of the instant claim was not contrary to Supreme Court precedent. Accordingly,

## RECOMMENDATION

It is hereby **RECOMMENDED** that the petition of Carlton Parks for issuance of a writ of habeas corpus under 28 U.S.C. §2254 be **DISMISSED WITH PREJUDICE.**

---

[75]St. Rec. Vol. 2 of 8, tab 7, district court's Order, Claim Five. St. Rec. Vol. 2 of 8, tab 8, State ex rel. Parks v. State, No. 2010-KH-358, p. 3 (La. App. 5 Cir. 5/7/10) (unpublished opinion). The state supreme court denied Parks' post-conviction writ application without opinion. State ex rel. Parks v. State, 69 So.2d 1134 (La. 2011).

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. §636(b)(1); Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996)(en banc).[76]

New Orleans, Louisiana, this  5th  day of _____November_____, 2013.

ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE

---

[76]Douglass referenced the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. §636(b)(1) was amended to extend that period to fourteen days.

54